CENTRAL TRUST CO. OF NEW YORK *v.* OHIO CENT. R. CO.

In the Matter of the Intervening Petition of the COLUMBUS, HOCKING VALLEY & TOLEDO RAILWAY COMPANY, asking for its Share of Earnings under a Pooling Contract.

(*Circuit Court, N. D. Ohio, W. D.* March 24, 1885.)

RAILROAD COMPANIES — EXECUTED POOLING CONTRACT — DISPOSITION OF FUND REALIZED BY RECEIVER.

Where a "pooling contract" entered into between two railroad companies has been fully executed, and the profits derived therefrom are collected and held by a receiver of one of the companies, he will not be allowed to retain the fund thus acquired, but will be decreed to pay it over to the other company in accordance with the terms of the contract, without regard to the validity of the original agreement.

In proceedings pending in the circuit court of the United States for the district of Ohio, Western division, at Toledo, brought by the

Central Trust Company of New York against the Ohio Central Railway Company, for foreclosure of mortgage, etc., an intervening petition was filed by the Columbus, Hocking Valley & Toledo Railway Company against the receiver, John E. Martin, by leave of court first obtained, in which it claims that there is due to it a large sum of money from said receiver, on the excess of his earnings, while operating said Ohio Central Railroad under a freight pooling contract, referred to more fully in the opinion. Upon the filing of said intervening petition, an order of reference was made to A. J. Ricks, Esq., as a special master, by request of counsel, to take testimony, and report upon the three points stated in the report of said master, which follows. Upon the filing of said report, the questions made by the petition and report were heard by Justice MATTHEWS, sitting in chambers, as circuit justice, at Washington, by request of the circuit judge.

MASTER'S REPORT ON THE INTERVENING PETITION OF THE COLUMBUS, HOCK-ING VALLEY & TOLEDO RAILROAD COMPANY.

*To the Honorable the Judges of the Circuit Court.*

Under the order of reference made in the above-entitled cause, upon the intervening petition of the Columbus, Hocking Valley & Toledo Railroad Company, the undersigned was directed to report:

*First.* "Whether the pooling contract mentioned and set forth in said petition was renewed by the receiver subsequent to his appointment and acceptance of his office, and if not, whether he and said petitioner recognized and acted in good faith upon the belief that said contract was in force and mutually obligatory upon them." Upon this part of the order I report that the original contract was made between the Columbus, Hocking Valley & Toledo Railroad, the Ohio Central Railroad, and the Baltimore & Ohio Railroad, Companies, on the thirteenth day of January, 1883; that J. E. Martin was appointed receiver of the defendant road on the twenty-ninth of September, 1883; and that said receiver, after his appointment, while not formally renewing said contract, continued to recognize it as in force by paying his monthly assessments of the expenses of the pool commission created by said contract as originally established and apportioned under it, and by reporting to it the amount of his business arising under the same. The receiver, in his testimony on this subject, says in substance that he acted upon and recognized said contract in good faith, but did not ask for instructions from the court in regard to the continuance of that pool, for the reason that at that time it was not expected that any cash balances would ever accrue under it, because, upon the basis upon which the business of the road had theretofore been conducted, he expected to come out just about even on the pooling business at the end of the year. It therefore appears very clearly, from the testimony of all concerned, that both of said parties to the contract recognized it and acted in good faith upon the belief that it was in force and mutually obligatory upon them.

*Second.* The second subject referred to in said order directs the master to "ascertain and report what caused the inequalities in the earnings of said contracting parties, and whether the diminished earnings of the petitioner arose from any dereliction or fault on its part, and if so he will state what such fault or dereliction was. Upon this part of the case the master will report fully the facts and state explicitly the equities of the respective parties as he shall find them to exist." In the contract entered into, as aforesaid, the percentage of business to be allowed each of the parties thereto, was apportioned

upon the basis of the actual coal transportation of each road for some years previous. This actual business showed that the coal produced along the line of road of the petitioner entitled it to 54½ per cent., and the Ohio Central to 27 per cent., of the coal transportation business originating within the territory named in said contract. The business, as conducted under said contract by the roads named, shows that each earned about its apportioned per cent. up to some time about July, 1884. About that time the petitioner herein, without any fault on its part so far as the evidence before me discloses, suddenly lost substantially all of its coal transportation business, because of a disagreement between the owners and operators of the coal mines along its line of road, and the employes and miners therein. The petitioner was not itself a producer and miner of coal, nor had it any interest as stockholder, or otherwise, in any coal producing company along its line of road. Said disagreement between the producers and miners of coal was, therefore, a matter which it could not control, except so far as it might influence the differences between the producers and miners by concessions in prices of transportation. The evidence before me shows that such concession was made on the part of petitioner and other parties to said contract, on all coal shipped to Columbus, by way of effort to reconcile and compromise the differences between the operators and their employes, and afford them a basis for a compromise, and thereby avert the long and ruinous strike that has prevailed in the mining regions penetrated by its line of road. These differences, however, were not adjusted, and for several months there was a substantial suspension of coal transportation upon the petitioner's road. In the mean time the mines along, and tributary to, the line of the Ohio Central road continued to produce coal, and the shipments over said road increased. In this way and for this reason, large inequalities in the earnings of the parties to said contract arose, and the Ohio Central Railroad received a great excess of coal business above the percentage allotted under the contract. For the reasons above stated, it does not appear from the evidence before me that the diminished earnings of the petitioner under said contract was the result of any fault on its part.

The evidence shows that the contract which was in force when the receiver of the defendant road was appointed, and which he has since recognized, afforded to shippers of coal along the lines of the railroads which are parties thereto, rates of transportation as low, if not lower, than was charged by any other railroad companies in the state, quantities and distances being equal. The facilities afforded to shippers and the rates for transportation were uniform, and fixed for a definite period. They were not higher than had been charged the public under the sharpest competition existing before the contract was made. So far, therefore, as the facts before me show, the parties to this contract entered into it free from any conspiracy, or intent, to impose upon the public higher rates for transportation, or to give fewer facilities for the transaction of the public business, than had before been afforded by them, or than was offered by other lines in the state; and if the contract is to be enforced, they stand upon the same footing, so far as the equities between them are to be adjusted. The inequality in their earnings was not caused by fault of one, or procurement of the other, but was the result of influences neither party originated or controlled, and, therefore, if the contract is one which the court can recognize and enforce, the petitioner is justly entitled to the net profits, which have accrued to the receiver upon the excess of coal business which went over his line of road, growing out of the suspension of the coal traffic on petitioner's road, as hereinbefore stated.

*Third.* I am further required by the order of reference to "show what amount, if anything, is due petitioner under said contract in the event it is enforced." I have not had presented to me the detailed statement of the business done by the roads affected by this contract, as shown by their reports to the pool commission, but the testimony shows that the receiver has trans-

ported a large excess over what his percentage of business under the contract would have been, but, for various reasons stated at length by him, he claims that, even if the contract is to be enforced, it should not be literally applied as to his earnings. The petitioner, by its officers and counsel, concur in the receiver's views in this respect, and I therefore accept his figures as fair, and report that if the contract is enforced there is due to the petitioner, the Columbus, Hocking Valley & Toledo Railroad Company, from the receiver of the defendant road, the sum of $50,000.

The parties interested were served with due notice of the hearing before me. The complainant was represented by its counsel, Swayne, Swayne & Hayes, and the receiver appeared in person and testified pursuant to notice and request from me. The petitioner was represented by Judge BURKE. All the testimony taken before me is filed herewith, marked Exhibit A, and, with this report, is respectfully submitted.

[Signed]                                        A. J. RICKS, Special Master.

*Butler, Stillman & Hubbard* and *Swayne, Swayne & Hayes,* for Central Trust Co., the complainants in the original proceedings.

*Stevenson Burke,* for the intervening petitioners.

MATTHEWS, Justice.    The petitioner prays for an order directing the receiver in this cause to pay over to it the sum of $50,000, in his hands, claimed to be due to it under a contract entered into January 13, 1883, between the petitioner, the Ohio Central Railroad Company, and the Baltimore & Ohio Railroad Company. The contract is of that description known as pooling contracts, and had reference to the coal business of the several roads, in respect to which they were competitors. It provided that the business and earnings of the parties should be equalized upon the basis of $54\frac{1}{2}$ per cent. to the petitioner, 27 per cent. to the Ohio Central, and $18\frac{1}{2}$ per cent. to the Baltimore & Ohio Railroad Company, the prices of transportation being fixed by commissioners appointed under the contract, and at the end of each year the joint earnings from this business, of which a separate account should be kept, were to be divided according to the same percentage, any excess received by a party to be paid over, after deducting one-half for the cost of carriage.

This contract was in force and in operation between the parties when the bill was filed in this case, and the receiver was appointed. No specific directions in regard to it were given to the receiver at the time of his appointment, or since, and thinking the contract fair, reasonable, and probably beneficial, he has continued to act under it. The percentages for division agreed upon, it appears, fairly represent the proportions according to which the business had been previously divided between the roads, when operating in competition, and the object of the arrangement was to maintain what the parties should deem to be reasonable, but remunerative, prices of transportation by taking away the motive for cutting rates. In consequence of the strike among the miners in the coal region through which their roads run, the amount of coal transported during the past year over the petitioner's road has been greatly reduced below its usual proportion, and that of the road of the Ohio Central relatively increased,

and in consequence a fund of $50,000, net receipts arising from that excess, has accumulated in the hands of the receiver. The order to pay it over, in accordance with the terms of the contract asked for by the petitioner, is resisted by the complainant in this suit on behalf of the mortgage bondholders, who are prosecuting the suit for a foreclosure and sale. The grounds of objection are:

*First,* that contract is illegal, being in restraint of trade, and void, as contrary to public policy; *second,* that it is void as *ultra vires,* the Ohio Central Railroad Company having no corporate power to enter into it; *third,* that the receiver was not authorized to recognize and continue it in operation.

In my opinion the receiver was well warranted in recognizing, adopting, and continuing in operation the contract in question. As an officer of the company at the time it was made, he participated in its execution and entered into it on behalf of his company, believing it to be a reasonable, just, and useful arrangement on behalf of all the interests he was bound to consult, both public and private. He was selected and appointed as a receiver in this cause at the instance of the complainant, and the bondholders whom it represents. It was not then thought necessary or expedient to limit his discretion in the practical management of the road, thus placed in his hands, by any express instructions. The existence of this contract, it must be presumed, was well known to those who are now seeking to repudiate it; if not, it might have been by the exercise of the slightest diligence. In consequence of casualties not foreseen at the beginning, it has eventuated in the accumulation of the cash balance now in controversy. The contract has been fully executed as to the transactions and business out of which that balance has grown.

The question now presented to me is not whether an unperformed and executory contract shall be enforced, nor whether damages shall be recovered against a party who refuses to operate under it. It is whether one party, who has received all the expected benefits to be derived from it, shall account for the fruits of its performance, which by its terms belong to another, and which, contrary to its terms, it retains. The contract, whether legal or not, was not binding on the complainant or the receiver; and if objected to in season, proper instruction would have been given in reference to its recognition and adoption. Failing to take proper steps to that end, the receiver was necessarily left at liberty to exercise his own judgment and discretion in reference to it. The contract itself was a customary one among railroads, and the receiver believed it to be reasonable and fair, and that it was expedient to continue it in force. This he has done with the result already stated. Good faith requires that the proceeds arising from its operation, and which by its terms belong to the petitioner, should be paid over to it, without regard to the questions now made as to the original validity of the contract. The receiver is accordingly directed to pay over to the petitioner the amount found to be due by the master, in accordance with the prayer of the petitioner.